UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION
____

SHAWN PAUL QUIGLEY,

        Plaintiff,

v.

HEIDI E. WASHINGTON et al.,

        Defendants.
_____/

Case No. 2:22-cv-2

Honorable Robert J. Jonker

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim. The Court will further deny Plaintiff's pending motions.

## Discussion

**I.**      **Factual Allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Thumb Correctional Facility (TCF) in Lapeer, Lapeer County, Michigan. The events about

which he complains, however, occurred at the Chippewa Correctional Facility (URF) in Kincheloe, Chippewa County, Michigan. Plaintiff sues the following MDOC administrative personnel: Director Heidi E. Washington and Chief Medical Officer Carmen McEntyre Leon. He further sues Corizon Health Chief Medical Officer Sylvia McQueen. Plaintiff also sues the following URF personnel: Warden Connie Horton, Health Unit Manager Bethany Stein, Nursing Manager Gerald Covert, and Doctor Stallman. Plaintiff additionally sues "Clinical Administration Assistant (R.N.)" Subrina Aiken of the "Jackson Health Care Office Administration." (Compl., ECF No. 1, PageID.3.)

Plaintiff alleges that starting around October 2020, after recovering from COVID-19, he had trouble breathing while sleeping. He informed healthcare by kite, and N.B. Martian (not a party) responded in person that Plaintiff's symptoms were consistent with sleep apnea. Martian said that she would notify Defendant Stallman so that he could schedule a sleep study.

Plaintiff was not scheduled for a sleep study in the weeks that followed, so Plaintiff began sending kites seeking updates. An unknown individual from URF's healthcare unit informed Plaintiff that Defendant Stallman was working remotely from home. Plaintiff later received a kite on March 3, 2021, that he was scheduled for a chronic care appointment on April 1, 2021.

Shortly before his scheduled appointment, on March 29, 2021, Defendant Stein wrote Plaintiff to tell him that Defendant Stallman would not be available for an in-person appointment until the middle of April.

On April 7, 2021, Plaintiff sent kites to Defendants Washington, Leon, McQueen, and Horton "expressing [his] health concerns" and purportedly referencing a case that involved "[d]eliberate [i]ndifference requirements." (*Id.*, PageID.4.) Plaintiff did not receive a response from any of those Defendants, so he filed grievances. Defendants Covert and Stein denied his

grievances at Step I. Defendant Horton denied his grievances at Step II, and Defendant Aiken denied his grievances at Step III.

When Plaintiff met with Defendant Stallman for the in-person appointment, Defendant Stallman approved the sleep study, but indicated that he also "had to get ACMO approval and scheduled" for the test. (*Id.*)

On April 22, 2021, Plaintiff again wrote Defendants Washington, Horton, and Stein, complaining of his healthcare. Plaintiff received a response on April 28, 2021, from an unspecified healthcare source explaining that DWH[1] had a backlog that apparently suggested his sleep study further would be delayed, and it was investigating options. The response further noted that Stein was awaiting a decision from DWH how to proceed. Shortly thereafter, on May 11, 2021, Plaintiff received Defendant Aiken's response to his Step III grievance appeal, which stated that DWH was closed, but Plaintiff was on the list for a sleep study. Plaintiff alleges that he continued sending kites to healthcare at URF asking for help and when his sleep study would be scheduled.

Plaintiff sent kites to Defendants Washington, McQueen, McEntyre, Horton, and Stein as well as to Keith Barber (not a party) on October 3, 2021. He received a response from Barber asking for his records. Plaintiff also received a response from Defendant Stein on October 5, 2021, explaining a new process for his sleep study and that it would be scheduled soon. Defendant Stein followed up on October 12, 2021, and told Plaintiff that his sleep study would occur by November 8, 2021. Defendant Stein again followed up on October 25, 2021, to tell Plaintiff that the equipment had shipped, but noting that several other patients were also waiting.

---

[1] DWH presumably refers to Duane Waters Health Center, known within the MDOC as DWH. DHW "has 152 inpatient beds, and houses prisoners whose medical needs cannot be met at other correctional facilities within the state." MDOC, *Health Care*, https://www.michigan.gov/corrections/services/health-care-services (last visited Aug. 12, 2022).

3

On November 2, 2021, with six days left in the window Defendant Stein provided, Plaintiff again wrote Stein, Washington, McEntyre, Leon, and Barber. Plaintiff alleges he did not receive a reply. On some unspecified date, Plaintiff received a callout, and he picked up his sleep study machine. Shortly thereafter, Defendant Stallman reviewed the test results with Plaintiff and purportedly said that the results were some of the worst he had seen. Defendant Stallman sought authorization for Plaintiff to receive appropriate sleep apnea equipment. According to the complaint, Defendant Stallman further stated that he hoped Plaintiff's use of the equipment would help to resolve conditions Plaintiff had developed that could relate to his apnea.

Approximately a month later, on December 8, 2021, Plaintiff had an appointment by video with a Dr. Vis (not a party), who specializes in respiratory conditions. Dr. Vis allegedly discussed how to properly use the equipment and told Plaintiff that his body underwent stress while awaiting treatment. Plaintiff contends that COVID-19 is no reason to excuse the lapses in Defendants' conduct.

Plaintiff seeks compensatory damages and injunctive relief.

## II. Pending Motions

Plaintiff also has two motions currently pending before the Court. Plaintiff has filed a motion for an extension of time to file the initial partial filing fee and a motion to appoint counsel. The Court will resolve each in turn.

### A. Extension of Time

After the Court granted him leave to proceed *in forma pauperis* in this action, Plaintiff filed a motion for an extension of time to file the initial partial filing fee. (ECF No. 4.) Since filing that motion, Plaintiff has paid the initial partial filing fee. At this time, Plaintiff's motion is, therefore, moot, and the Court will deny it as such.

### B. Appointment of Counsel

Plaintiff has also filed a motion to appoint counsel. (ECF No. 8.) Indigent parties in civil cases have no constitutional right to a court-appointed attorney. *Abdur-Rahman v. Mich. Dep't of Corr.*, 65 F.3d 489, 492 (6th Cir. 1995); *Lavado v. Keohane*, 992 F.2d 601, 604–05 (6th Cir. 1993). The Court may, however, request an attorney to serve as counsel, in the Court's discretion. *Abdur-Rahman*, 65 F.3d at 492; *Lavado*, 992 F.2d at 604–05; *see Mallard v. U.S. Dist. Ct.*, 490 U.S. 296 (1989).

Appointment of counsel is a privilege that is justified only in exceptional circumstances. In determining whether to exercise its discretion, the Court should consider the complexity of the issues, the procedural posture of the case, and Plaintiff's apparent ability to prosecute the action without the help of counsel. *See Lavado*, 992 F.2d at 606. The Court has carefully considered these factors and determines that the assistance of counsel does not appear necessary to the proper presentation of Plaintiff's position. The Court will therefore deny Plaintiff's motion.

### III. Failure to State a Claim

A complaint may be dismissed for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility

standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470–71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(ii)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff's putative claim arises under the Eighth Amendment.

### A. Defendants Washington, Leon, McQueen, Horton, Covert, and Aiken

As a preliminary matter, Plaintiff fails to make specific factual allegations against Defendants Washington, Leon, McQueen, Horton, Covert, and Aiken, other than his claims that they failed to investigate or otherwise adequately respond to his grievances and kites. Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of respondeat superior or vicarious liability. *Iqbal*, 556 U.S. at 676; *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691(1978); *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009). A claimed constitutional violation must be based upon active unconstitutional behavior. *Grinter v. Knight*, 532 F.3d 567, 575–76 (6th Cir. 2008); *Greene v. Barber*, 310 F.3d 889, 899 (6th Cir. 2002). The acts of one's subordinates are not enough, nor can supervisory liability be

based upon the mere failure to act. *Grinter*, 532 F.3d at 576; *Greene*, 310 F.3d at 899; *Summers v. Leis*, 368 F.3d 881, 888 (6th Cir. 2004). Moreover, § 1983 liability may not be imposed simply because a supervisor denied an administrative grievance or failed to act based upon information contained in a grievance. *See Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). "[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. Plaintiff has failed to allege that Defendants Washington, Leon, McQueen, Horton, Covert, and Aiken engaged in any active unconstitutional behavior. He therefore fails to state a claim against them. Accordingly, the Court will dismiss them from this action.

### B. Defendants Stallman and Stein

In contrast, Plaintiff's allegations involving Defendants Stallman and Stein relate to their specific conduct.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment against those convicted of crimes. U.S. Const. amend. VIII. The Eighth Amendment obligates prison authorities to provide medical care to incarcerated individuals, as a failure to provide such care would be inconsistent with contemporary standards of decency. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). The Eighth Amendment is violated when a prison official is deliberately indifferent to the serious medical needs of a prisoner. *Id.* at 104–05; *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001).

Deliberate indifference may be manifested by a doctor's failure to respond to the medical needs of a prisoner, or by "prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983." *Estelle*, 429 U.S. at 104–05.

7

A claim for the deprivation of adequate medical care has an objective and a subjective component. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). To satisfy the objective component, the plaintiff must allege that the medical need at issue is sufficiently serious. *Id.* In other words, the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm. *Id.* The objective component of the adequate medical care test is satisfied "[w]here the seriousness of a prisoner's need[] for medical care is obvious even to a lay person." *Blackmore v. Kalamazoo Cnty.*, 390 F.3d 890, 899 (6th Cir. 2004); *see also Phillips v. Roane Cnty.*, 534 F.3d 531, 539–40 (6th Cir. 2008). Obviousness, however, is not strictly limited to what is detectable to the eye. Even if the layman cannot see the medical need, a condition may be obviously medically serious where a layman, if informed of the true medical situation, would deem the need for medical attention clear. *See, e.g.*, *Rouster v. Saginaw Cnty.*, 749 F.3d 437, 446–51 (6th Cir. 2014) (holding that a prisoner who died from a perforated duodenum exhibited an "objectively serious need for medical treatment," even though his symptoms appeared to the medical staff at the time to be consistent with alcohol withdrawal); *Johnson v. Karnes*, 398 F.3d 868, 874 (6th Cir. 2005) (holding that prisoner's severed tendon was a "quite obvious" medical need, since "any lay person would realize to be serious," even though the condition was not visually obvious). If the plaintiff's claim, however, is based on "the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious," *Blackmore*, 390 F.3d at 898, the plaintiff must "place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment," *Napier v. Madison Cnty.*, 238 F.3d 739, 742 (6th Cir. 2001) (internal quotation marks omitted).

The subjective component requires an inmate to show that prison officials have "a sufficiently culpable state of mind" in denying medical care. *Brown v. Bargery*, 207 F.3d 863, 867

8

(6th Cir. 2000). Deliberate indifference "entails something more than mere negligence," but can be "satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Farmer*, 511 U.S. at 835. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. To prove a defendant's subjective knowledge, "[a] plaintiff may rely on circumstantial evidence . . . : A jury is entitled to 'conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Rhinehart v. Scutt*, 894 F.3d 721, 738 (6th Cir. 2018) (quoting *Farmer*, 511 U.S. at 842)).

However, not every claim by a prisoner that he has received inadequate medical treatment states a violation of the Eighth Amendment. *Estelle*, 429 U.S. at 105. As the Supreme Court explained:

> [A]n inadvertent failure to provide adequate medical care cannot be said to constitute an unnecessary and wanton infliction of pain or to be repugnant to the conscience of mankind. Thus, a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 105–06 (quotations omitted). Thus, differences in judgment between an inmate and prison medical personnel regarding the appropriate medical diagnoses or treatment are not enough to state a deliberate indifference claim. *Darrah v. Krisher*, 865 F.3d 361, 372 (6th Cir. 2017); *Briggs v. Westcomb*, 801 F. App'x 956, 959 (6th Cir. 2020); *Mitchell v. Hininger*, 553 F. App'x 602, 605 (6th Cir. 2014). This is so even if the misdiagnosis results in an inadequate course of treatment and considerable suffering. *Gabehart v. Chapleau*, No. 96-5050, 1997 WL 160322, at *2 (6th Cir. Apr. 4, 1997).

9

The Sixth Circuit distinguishes "between cases where the complaint alleges a complete denial of medical care and those cases where the claim is that a prisoner received inadequate medical treatment." *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). If "a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Id.*; *see also Rouster*, 749 F.3d at 448; *Perez v. Oakland Cnty.*, 466 F.3d 416, 434 (6th Cir. 2006); *Kellerman v. Simpson*, 258 F. App'x 720, 727 (6th Cir. 2007); *McFarland v. Austin*, 196 F. App'x 410 (6th Cir. 2006); *Edmonds v. Horton*, 113 F. App'x 62, 65 (6th Cir. 2004); *Brock v. Crall*, 8 F. App'x 439, 440–41 (6th Cir. 2001); *Berryman v. Rieger*, 150 F.3d 561, 566 (6th Cir. 1998). "Where the claimant received treatment for his condition, as here, he must show that his treatment was 'so woefully inadequate as to amount to no treatment at all.'" *Mitchell*, 553 F. App'x at 605 (quoting *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011)). He must demonstrate that the care he received was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005) (quoting *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989)).

Here, Plaintiff does not contend that Defendants Stallman and Stein completely denied him medical care; he instead alleges that he received inadequate medical treatment. According to Plaintiff's own allegations, Defendants Stallman and Stein took multiple steps to respond to Plaintiff's suspected sleep apnea. Notwithstanding Defendant Stallman working remotely for several weeks or months for unspecified reasons during the COVID-19 pandemic, Defendants Stein and Stallman scheduled Plaintiff for a chronic care appointment that occurred in mid-April 2021. The appointment was soon after Defendant Stallman became available. At that appointment,

10

presumably Defendant Stallman's first appointment with Plaintiff after healthcare staff suspected that Plaintiff had sleep apnea, Stallman approved the sleep study that Plaintiff wanted. Later, in early October 2021 after delays that appear to have been beyond the control of Defendants Stallman and Stein, Stein provided updates to Plaintiff that the process had changed for the sleep study, and that Plaintiff would be scheduled soon. Plaintiff was called out for a healthcare visit in mid-October, and Stein updated Plaintiff to inform him that the study would be completed by November 8. In late October, Stein again updated Plaintiff to inform him that the necessary equipment had shipped. Although Plaintiff omits when he received the sleep study equipment, his allegations are consistent with completing the sleep study by November 8, 2021, as Stein had stated. After the study, Defendant Stallman reviewed the results and sought approval to issue Plaintiff equipment to treat his sleep apnea.

In a situation like this, "[t]he key inquiry is whether" Defendants Stallman and Stein "responded reasonably" to Plaintiff's suspected sleep apnea. *See Wilson v. Williams*, 961 F.3d 829, 840 (6th Cir. 2020) (quoting *Farmer*, 511 U.S. at 844). Plaintiff's own allegations suggest that they did respond reasonably. They sought and arranged for diagnostic testing, updated Plaintiff as information became available, provided Plaintiff the equipment to test and to treat, and reviewed the test results with Plaintiff. Plaintiff's argument that he was provided inadequate medical treatment has little to do with the conduct of Defendants Stallman and Stein, and instead with delays apparently connected to the COVID-19 pandemic such as the backlog at, and temporary closure of, DWH. Yet, Plaintiff does not allege, for example, that he notified Defendants Stallman and Stein during the delay that his condition had deteriorated, and they ignored him. Nor does he allege that they ignored any urgent requests for treatment. In short, none of Plaintiff's allegations suggest that either Stallman or Stein provided Plaintiff care "so grossly incompetent, inadequate,

or excessive as to shock the conscience or to be intolerable to fundamental fairness." *See Miller*, 408 F.3d at 819. Indeed, Defendants Stallman and Stein appear to have responded reasonably to Plaintiff's suspected sleep apnea. Consequently, Plaintiff fails to state an Eighth Amendment claim against them. *See Farmer*, 511 U.S. at 844. Accordingly, the Court will dismiss Plaintiff's claims.

## Conclusion

The Court will deny Plaintiff's pending motions. Further, having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). Although the Court concludes that Plaintiff's claims are properly dismissed, the Court does not conclude that any issue Plaintiff might raise on appeal would be frivolous. *Coppedge v. United States*, 369 U.S. 438, 445 (1962). Accordingly, the Court does not certify that an appeal would not be taken in good faith. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610–11, unless Plaintiff is barred from proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

An order and judgment consistent with this opinion will be entered.

Dated: August 18, 2022      /s/ Robert J. Jonker
                            Robert J. Jonker
                            United States District Judge